The Judges pronounced their opinions.
JODGH TUCKHR.
(After stating the case as above,) One *cf the exceptions taken to the declaration by Mr. Warden was, that the bond is therein called a bill obligatory. I doubt whether it would have availed him on a special demurrer, even if there had not been a recital in the declaration, of the condition : his second objection, that it was not alleged that the parties bound themselves jointly and severally', appeared to me to have much mote weight, William Duval being sued alone: but Mr. Williams satisfied me upon that point: that, after oyer, the bond becomes part of the record, and the court must judge upon the whole record, 5 Gwill. Bac. (tit. Oyer,) p. 438, citing 3 Salk. 119; Hob. 217; *40 Show. Cas. Parl. 221; Carth, 513, says it becomes part of the declaration, and is not part of the plea. In Leftwich v. Berkely, (a) the Court took notice of the bond as part of the record, though no oyer was demanded: but the error there also appeared in the declaration; so that I lay no stress upon that case as to this point. Now here, by the oyer, it appears the bond was several as well as joint; and therefore, according to the principles established in that case, as well as in Berkely v. Boxley, (b) the suit might be maintained against either of the obligors alone, or against the whole jointly. The third objection made by Mr. Warden applies to the recital of the bond, and not to the refusal of payment, as alleged in the declaration, and is therefore unimportant. The fourth is contrary to my understanding of the record; since I can perceive a clear breach of the condition from the tenor of the verdict.
Mr. Call’s objections appeared to me entitled to consideration. I doubted with him whether the bond, not being payable to the Sheriff and his successors in office, was in due form; but there is no form prescribed by the statute; and, as the statute gives the Sheriff a special power to assign the bond to the creditor, which has been done in this case, the assignment was sufficient to enable the plaintiff to sue upon it in her own name. Had not this been the 80 case, *1 should scarcely have doubted whether a court could have disregarded the error in the date of the assignment in the declaration, being truly found in the special verdict, (c) The reason given why the bond should have been taken to the Sheriff and his successors, and delivered to the succeeding Sheriff, that he may have notice that the party was entitled to the benefit of the prison bounds, seems inapplicable to the present case; for Young-husband has shewn under his hand and seal, that he knew Duval was entitled to them: having expressly so stated it in the instrument of discharge. Nor can I agree with Mr. Call, that the bond was taken for the benefit of the Sheriff, or for his indemnification: the recital.in the act shews it to be for the benefit of the prisoner, whose health might suffer by a close confinement.
Upon the merits of this case I have never felt the smallest doubt, except as it has been excited by a difference of opinion from the Judges who pronounced the judgment in the District Court, and from those, with whom I have the misfortune to differ in opinion, in this Court. A prisoner who gives security for the prison bounds, is from thenceforward no otherwise in the custody of the Sheriff, than as may be sufficient to protect the Sheriff against any suit which the creditor may bring against him for not confining the debtor within the walls of the prison. He is in the eye and contemplation of the law, a true prisoner; being, as was said in the case of Lysle v. Stephenson, (d) in the custodjr of the law: but the Sheriff hath no longer any power over him, either to restrain him, or to discharge him, if he reside not within the prison. If the prisoner should depart from the bounds within view of the Sheriff, he must apply for an escape warrant before he can retake him; and this he is required to do immediately; and, moreover, immediately to give notice to the creditor or his attorney, or agent, and to assign over the prison-bounds bond. A neglect in either of these particulars will render the Sheriff himself liable; but nothing else will, unless 81 the security to the bond shall *after-wards be found to have been insufficient to pay the debt when the bond was taken.
I have carefully examined the acts of assembly to discover what fees a gaoler would have a right to demand of a prisoner within the prison bounds; and I can find none except the fee of Is. 6d.* per day for maintaining him in diet. Now, according to the principles established in the case of Bose v. Shore, 1 Call, 540, it ought to have been averred and proved that Duval was unable to pay that fee, before the sheriff could have a right to demand it from the creditor; a fortiori, it is equally necessary that that fact should be established, before the Sheriff could be authorized to discharge him out of his custody, and thereby deprive the creditor of the satisfaction which the law allowed him for his debt. I will go further; it being found in this case that Daniel Duval did, himself, rent a house within the prison bounds, and reside herein, and that he did not reside in the prison, the presumption (if any presumption were to be made) is, that he maintained himself: if, in fact, the gaoler had found him in victuals, it ought to have been so found in the verdict; and it ought, moreover, to have been found that he was ■unable to pay the gaoler the legal fee for so doing, and, without such finding, the creditor could not in this case be made liable to the Sheriff for it. If any presumption arises from this special verdict, it is, that Duval was able to pay his prison fees, since he had credit enough to hire a house within the prison bounds, although he never in fact paid any rent for it.
In whatever point of view I consider this case, the instrument of discharge has always appeared to me not to be a discharge by due course of law: and the voluntary departure of Mr. Duval' from the prison bounds, (within which he actually rented and occupied a house for his accom82 modation, ^'instead of being shut up within the walls of the prison,) under colour of that discharge, was a breach of the condition of the bond, as much as if he had departed without one. I am consequently of opinion, that the judgment ought to be reversed, and entered for the plaintiff.
JUDGE ROANE.
There are some preliminary objections in this case, which it will be first necessary to dispose of.
It is objected that this is an action against one of three obligors, on a bond, *41 which, as described in the declaration, is only a joint bond. The answer is, that this defect is cured by oyer, which has incorporated into the declaration a bond which is joint and several.
Again it is said, that the plaintiff’s case is imperfect in this, that the departure by D. Duval is stated to have been on the 1st of September, 1790, and the assignment by W. F. on the 1st of March, 1790; so that it would seem that no breach had taken place at the time of the assignment to the appellant. The answer is, that this, in relation to the last dale, is evidently an error arising from copying the figure O into the declaration, by mistake, instead of the figure 6. This is evident from the last date being stated to have been “afterwards,” in relation to the first. But what is a more complete answer is, that the assignment itself on the back of the bond, is exhibited upon oyer, together with the bond; and is also found in the special verdict, and, in both instances, the assignment is shewn to have been made on the 1st of March, 1796; so that, whether we consider the case upon the declaration only, as aided . by oyer, or on the special verdict merely, the assignment appears to have been long posterior to the breach.
To consider the merits: I have no doubt but that the creditor of an insolvent prisoner, who has the liberty of the rules, is as much bound to give security for the prison fees, as the creditor of one in close gaol. This was decided in the case of Rose v. Shore, (a) and is evident upon a general view of the law on this subject. Again, a pris83 oner of the 'x'former description, is equally within the meaning of the acts authorizing a transfer of prisoners by a preceding to a succe.eding Sheriff. He is equally a prisoner as to the purpose aforesaid, though, after giving a bond to keep the rules, it is lawful for the Sheriff (in favour of the prisoner’s health) “to permit him to go out of the prison and return at his pleasure.”(b) This idea, of his remaining still a prisoner as to the purpose of a transfer, is not destroyed by the change of the Sheriff’s duty and liability in the event of an escape. That change was rendered necessary by the liberty of the rules thus granted, but does not render him the less a “true prisoner, ” in the language of the act upon this subject. The bond taken by the Sheriff, for keeping the rules, is as much a muniment of safety in behalf of the creditor, as the keys of the gaol are in relation to a prisoner in close custody; and, when legally taken according to the provisions of the act, would seem to me as much to devolve on a succeeding Sheriff, at the expiration of the preceding Sheriff’s term of office, as the keys themselves; and this, although the act of 1764, c. 6, s. 1, makes it the duty of the Sheriff to assign over the bond “by him” taken: this word “him” (which in this place is used in the general) is inadequate to exclude the succeeding Sheriff from the power to assign the bond under the force of the foregoing principles. The bond devolves on the succeeding Sheriff on two grounds; 1st. For his own sake, in order to enafal.e him to protect himself against the creditor, by the assignment of it in the event of an escape; and, 2dly. In behalf of the creditor, as that, before the act of 1795, was the only mean of his deducing a regular assignment of it to himself.
Prior to the act of 1795, allowing the assignment of bonds with collateral conditions, this was the only means by which a creditor could obtain an assignment of a prison-bounds bond; and this, possibly, may still be the case in relation to bonds duly taken under the act, payable to the Sheriff for the time being, and his successors. In relation to them, it might be argued that the power of the preceding Sheriff 84 *over them ceased with the transfer of the prisoners to whom they relate, and whom they should accompany into the hands of the succeeding Sheriff. It is true the act authorizing bonds of this description is silent, not only as to the capacity in which it is to be given to the obligee, but also as to the party who is to be that obligee: but it results from all the foregoing considerations, that it ought to be taken payable to the Sheriff for the time being, and his successors in office.
But the bond before us is not made payable to the “successors” of William Foushee. It is made payable to William Foushee, Sheriff of Henrico, “his certain attorney, his executors, administrators and assigns.” While these last words in the solvendum of the bond are controlled by those of the teneri, which only mention “William Foushee, Sheriff of Henrico,” on the authority of the case of Wilkinson v. M’Lochlin, (c) and denote it to be a public bond, not a private one to enure to William Foushee’s executors; this circumstance is nevertheless conclusive to show that the “successors” of the Sheriff were not intended to be embraced thereby: and, therefore, in deciding this case, it is not necessary to say that a bond given to a Sheriff simply, without words of limitation or restriction, does not enure to his successor, in the same manner as if his successors had been expressly named. This is a point on which I have formed no conclusive opinion : but this I say, that this bond being evidently a prison-bounds bond, and not a private bond, although it is defective in the foregoing particular, so as to intercept the power of the succeeding Sheriff, may still be sued upon by the creditor as at common law, since the commencement of the act of 1795, allowing the assig-nment of bonds with collateral conditions;" and that there is nothing in the declaration tying down this proceeding to the act allowing assignments of bonds for the rules: the averment in the declaration may equally be taken to relate to the act of 1795, before mentioned.
It is here to be remarked, that the act of 1795 took effect *from the 1st of March, 1796, inclusive, on which day the assignment in question was made. As, therefore, the assignment was made after the commencement of the act, although the bond bore date before, I infer that the action upon the. assignment is *42 sustainable. I infer this on the authority of the decision of this Court in the case of Craig v. Craig. (a) In that case the suit was brought upon a bond dated in 1792, and the judgment was reversed because “the bond was not assignable at the time the suit was commenced.” I infer that it was no objection to the action in that case, that the bond was anterior, if the assignment had been posterior to the commencement in operation of the act of 1795. Such a construction does not invade any vested right; for, while that act changes the remedy by giving a more direct recourse against the debtor, it neither affects nor increases his liability, nor prejudices the interests of the succeeding Sheriff.
With respect to the excuse set up in the case before us, the plaintiff has shewn every thing necessarj' on her. part. She has exhibited the bond conditioned for keeping the rules, and shewn a departure therefrom. The defendant can only absolve himself by shewing that the prisoner was discharged by due course of law, or, in other words, was legally discharged. This necessarily involves the legality of the acts and proceedings of the Sheriff; and it is no novelty for one man to engage for the correct conduct of another. It was sufficient for the creditor, after having shewn what is before mentioned, to remain entirely passive. It was also incumbent on the defendant to shew that the prisoner was “insolvent,” and that, being so, the plaintiff had refused to pay his fees, or give bond for the payment thereof. All these positions are entirely settled by the case of Rose v. Shore, (b)
Upon the whole matter, I am of opinion that, though this particular case may bear hard on the present appellee, yet that the condition of the bond has not been kept, and that the appellant, by a reversal of the judgment of the District Court, should be enabled to recover her debt.
*JUDGE DEEMING.
Differing in opinion, in this important case, from a majority of the Court, I have taken a comprehensive view of the subject, and hope to be excused for taking more time than usual, in stating the grounds of my opinion.
The great question seems to be whether Daniel Duval (the principal obligor in the bond on which the suit was instituted) was discharged out of custody by due course of law? And this question may be considered under two distinct heads. First, whether Isaac Younghusband, into whose custody the prisoner was delivered over by William Foushee, a former Sheriff, had a right by law to discharge him, on the creditor’s failing to give security for the prison fees? and if not,
Secondly, whether the written discharge of the prisoner, by the Sheriff, did not exonerate the securities from the penalty of the bond, given for his keeping within the prison rules; and leave the creditor to her remedy against the Sheriff only.
In order to decide the first point, it may not be amiss to take a short view of the several acts of assembly so far as they apply to the case before us.
By the act of 1748, c. 4, s. 31, the justices of every county are required to mark, and lay out, the bounds and rules of their respective county prisons, not exceeding ten acres adjoining such prison; and every prisoner committed on civil process, giving good security to keep within the said rules, shall have liberty to walk therein; and keeping continually within the said bounds, shall be judged in law a true prisoner. By the act of 1764, c. 6, s. 3, it is enacted that the prison bounds shall not contain less than five acres.
By the act of 1748, c. 8, s. 28, it is provided that the prison fees of insolvent debtors be paid by the counties for the first 20 days, and afterwards by the creditors.
I conceive that Daniel Duval, after having executed the bond for keeping within the prison rules, stood precisely 87 *in the same situation (as far as it can affect this controversy) as if he had been confined in the debtor’s room of the county gaol; the place and extent of his confinement being only changed by the lenity and humanity of the law, as extended to all unfortunate debtors. But in the argument, it was contended by the appellant’s counsel, that, after the bond was given for keeping the prison bounds, the prisoner was out of the jurisdiction, or control, of the Sheriff, who had no further concern or right to meddle with him; but it is presumed that this part of the argument would have been omitted, had the counsel either adverted to the reason of the case, or to the law itself, which says that “such person shall be judged in law a true prisoner;” and, if not the prisoner of the Sheriff, they should have explained to the Court whose prisoner he then became, and on what conditions, and by whom, he could have been legally discharged out of custody. The creditor neither resided, nor had an agent, in the county.
The counsel indeed say, that “on Duval’s having given bond to keep within the prison rules, he became the prisoner of the law, and the Sheriff had nothing further to do with him: but can the law execute itself? must it not have an agent or ministerial officer, to execute it? can it feed an insolvent debtor, unable to purchase an ounce of food to sustain life, without an active agent to procure it for him? And who, let me ask, is the agent or ministerial officer of the law on such occasions, but the Sheriff?
By the act of 1748, c. 6, s. 16, it is enacted that “the delivery of prisoners by indenture between the old sheriff and the new, as practised in England, or the entering upon record in the County Court, the names of the several prisoners, and causes of their commitment, delivered over to the new Sheriff (the mode pursued in the case before usl shall be sufficient to discharge the late Sheriff from all suits or actions, for any escape that shall happen after-wards” and after the transfer in this case, (remaining on the records of Henrico County Court,) in which it is stated 88 - that *Daniel Duval was a prisoner at *43 the suit of Anne Meredith, administratrix of John Meredith, deceased, for the quantity of 40,9141b. crop tobacco including interest, &c. ; and also 4001b. of gross tobacco, and 3 shillings for costs in the General Court, which was a sufficient description of the cause of his commitment, as required by law. Duval was as much the prisoner of Younghusband as he had before been of the preceding Sheriff. Could there ever have been a doubt as to the debtor being the prisoner of the Sheriff, it appears to me that it must have been' removed by a fair construction of the act of 1764, c. 6, s. 1, wherein it is enacted that, when any prisoner shall escape out of the prison rules, the Sheriff of the County where such prisoner was in custody shall apply to a justice for an escape warrant, to retake such prisoner, and immediately to give notice to the creditor, his attorney or agent; and to assign over, and deliver the bond taken for the prison rules. If such prisoner he retaken on the escape warrant, it would be the duty of the Sheriff to commit him to close prison, and the assignment of the bond, directed, is to enable the creditor to bring an action for a breach of the condition.
And with respect to the prison fees, the laws make no distinction between those who are in close confinement, and those who have liberty of the bounds.
By the position of the appellant’s counsel, the prisoner could not have been discharged, had he tendered to the Sheriff the full amount of the debt and costs — and whjr? because, say they, 1 ‘after the prisoner had given bond for keeping within the prison rules, the Sheriff could have no further concern with him.” And who, let me ask, but the Sheriff, who has the execution in his pocket, or returned it to the office, is to know when its full amount is tendered by the prisoner? The creditor is without an agent and out of the county, nobody knows where!
By an act of 1764, c. 6, s. 10, it is enacted that, where the debtor shall have remained in execution twenty days, it shall be lawful for the Sheriff or gaoler to give 89 notice to the ^attorney who prosecuted the suit, and to demand security of him for the prison fees that shall arise after the expiration of 20 days, and, if he shall fail or refuse to give such security', then to discharge such prisoner out of custody. And, by an act passed in 1769, c. 3, s. 13, after reciting that it is unreasonable for Sheriffs to go out of their Counties to give notice to creditors, at whose suit any person may be in custody of such Sheriff, or to pay money levied by executions, it is enacted, that such creditor shall name some person resident in the County where such execution is to be levied, to be his or her agent, &c. : and, in case of failure in appointing such agent, the Sheriff shall not be obliged to give notice previous to the discharge of such prisoner, either for want of security for his prison fees, or upon his taking the oath of an insolvent debtor; but such prisoner may be discharged in those cases respectively without any notice being given to the creditor.
It was under this act that Younghusband, (then Sheriff of Henrico county,) in February, 1790, discharged the prisoner Daniel Duval; because the creditor had appointed no agent within the County to whom he could have given notice of the prisoner’s being in his custody; and of whom he might have demanded security for the prison fees; the Sheriff, under those circumstances, standing precisely in the same situation in which he would have been, had he given actual notice to the creditor who had refused or neglected to give the security required by law.
As to the bond, found by the verdict to have been executed by Mrs. Meredith, the creditor, and rejected by the former Sheriff, because the security was not a resident of the County, Younghusband could not be affected by it, being (for any thing that appears to the contrary) without his knowledge, and was executed and payable to the former Sheriff (Foushee) before the debtor became Younghusband’s prisoner.
By ihe act of 1772, c. 13, s. 1, so much of the act of 1748, as directs the prison fees of insolvent debtors for the 90 *first 20 days to be paid by the Counties; is repealed, and the Sheriff or gaoler may demand and receive of the creditor all such fees as become due until the creditor shall release such prisoner; and if the creditor, upon notice to him or her, his or her agent or attornex’, shall refuse to give security to the Sheriff or gaoler for the payment of such x^rison fees, or shall fail to pa>r the same, when demanded, it shall be lawful for such Sheriff or gaoler to discharge such debtor out of prison.
Thus stood the several acts of assembly on this subject prior to the revolution, so far as they apply to the case now before us; holding up the idea throughout, according to my conception, that the creditor, in every case, was to stand between the Sheriff and insolvent prisoner, with respect to the prison fees.
In the act of October, 1777, for establishing a General Court, c. 17, s. 72, it is enacted that trie keeping of the public goal shall constantly attend the General Court, and execute the commands of the Court from time to ti'me; and take or receive into his custody all persons by the Court to him committed on original or mesne process, or in execution in any civil suit, or for any contempt of the Court, and him or them safely keep until thence discharged by due course of law; but where such prisoner is so poor as not to be able to subsist him or herself, in prison, the gaoler shall be allowed b3' the public one shilling per day for the maintenance of every such poor prisoner, &c. The same clause with a little variation is re-enacted in the act of 1788 for the establishing District Courts, s. 98, and retain in the act of 1792, except that in the latter 17 cents, instead of one shilling, per day, is allowed for the maintenance of every such poor prisoner.
Why the law made a distinction between those imprisoned by order of the General. Court and by process of the District Courts and others, seems immaterial to be considered here, as the case now before us cannot be affected by it.
*From this view of our different *44 acts of assembly on the subject, one general system seems to have been formed; and, taking the whole together, I must give them such a construction as appears to me most consonant to reason, and to the views of the respective legislatures, at the different periods when they were enacted; and that they may not clash one with another. One general principle seems to pervade the whole, that every person imprisoned for debt shall, if able, bear the charges of his or her maintenance; and if not, that the creditor, at whose suit such person may be in confinement, (except in the cases just above noticed,) shall be responsible, and immediately give security to the Sheriff, or gaoler, for the prison fees, or submit to the discharge of the debtor.
And here a difficulty, and a difference in opinion seems to arise, respecting the true and just construction of the law ; how, and at what time, the inability of the debtor to pay the fees, or to maintain him or herself in prison, must appear, before the creditor can be made answerable for them, or be compelled to give security for their payment. It is contended, however, that it is incumbent on the Sheriff to ascertain, and prove, the insolvency before he can legally call on the creditor for security; but, in my conception, neither the letter, spirit, nor reason of the law, warrants such construction ; which, besides the delajq would often involve the unfortunate prisoner in still deeper distress: and who, let me ask, is the most likely to be acquainted with the circumstances of the debtor, one who had dealings with, and trusted him for the amount of the debt; or the Sheriff, who, perhaps, never saw or heard of- him till a process was put into his hands; which Has been the case, in numberless instances; as many of the insolvent debtors are fugitives from their creditors; and, if there must be a risk, or a loss, to one or the other, the law, and, in my conception, reason and justice, all declare it ought to fall on him who imprudently trusted the debtor beyond his ability to pay. And this is no hardship on the unwary creditor, as the law provides that, if such insolvent debtor shall 92 afterwards acquire ^property, he shall still have his remedy against him for the prison fees. Should a contrary construction of the law prevail, which should oblige the Sheriff to prove actual insolvency before he could demand security of the creditor for the prison fees, it will, in my apprehension, render the acts of 1764, 1769, and 1772, which forms a regular system, almost nugatory, and so many dead letters; and be productive of much litigation, great injustice to Sheriffs, and further distress to many unfortunate debtors.
In what manner, and before what tribunal, it may. be asked, is a Sheriff to prove the insolvency of an imprisoned debtor to the satisfaction of the creditor, before he can legally demand of him the security required by law, which, since the act of 1772, gives the Sheriff a right to demand such security, the moment the debtor is committed to prison?
Rrom the general tenor of those acts, it appears to me that the legislature justly •presumed, (until the contrary should appear, as in the case of Rose and Shore, to be further noticed hereafter,) that every person confined in gaol for debt was unable to pay the prison fees; and the proof of solvency ought to be on the creditor: 1st, Because he is the occasion of the debtor’s being confined, which is supposed to be for his own benefit; in consequence of which the law calls upon him immediately to give security for the prison fees; 2dly. Because an affirmative is more easily proved than a negative; and, 3dly. Because the Sheriff, being an executive officer, is obliged 'to execute all legal process put into his hands by the creditor; and whose commissions upon executions for small sums, where the debtors are imprisoned, are .very inadequate to his services; and therefore ought not to be delayed, run any risk, or put to extraordinary trouble without due compensation.
The case of Rose and Shore has been much relied on, as decisive in favour of the appellant here; but in my conception it is the reverse; as the case appears to be essentially different.
A Mr. Claiborne was imprisoned for debt, within the *bounds, at the suit of Shore; who, agreeably to the requisition of the law, upon a presumption that Claiborne was insolvent, gave bond as usual, to Rose, the gaoler, for the prison fees; who, from time to time received them from Shore, at Is. 3d. per day for upwards of IS months. Shore having after-wards discovered that Claiborne was possessed of a considerable estate, brought an action of assumpsit against Rose for so much money had and received to his use. On the trial there was a special verdict, in which the Jury expressly found “that Claiborne was, during all that time, possessed of sufficient property, and able to maintain himself in prison, without the aid of the said fees; and that he was not maintained by the said defendant; whereupon the District Court gave judgment for the plaintiff; which, on an appeal, was affirmed by the unanimous opinion of this Court, upon the ground (so far as my opinion concurred) of the special finding of the Jury above stated. But there is no such finding, nor any thing similar, in the case before us. On the contrary, the Jury here find that Duval resided in a house distinct from the the prison, but within the rules; for the rent of which he contracted with John Henry, the proprietor, but the rent never has been paid: which finding of the Jury was more than nine years after Duval was discharged out of custody: from whence a strong presumption arises, that he really was insolvent, being impliedly found so by the verdict; more especially as debts, for rent are recoverable in a summary way by distress.
And in order to assimilate this case to that of Rose and Shore, the Jury ought here to have found that Duval was possessed of sufficient property, and able to maintain himself in prison, and that he was not maintained by the Sheriff or gaoler.
If Younghusband discharged Duval as an .insolvent debtor unable to pay the prison fees, when he was not so, he thereby made himself liable for the debt: and suppose this had been a suit to compel *45 94 him to pay it, what would *have been the gist of the action? the ability of the prisoner to pay the fees, or to maintain himself in prison, which the plaintiff must have averred and proved, (as in the case of Shore against Rose,) before he could have had a verdict in his favour.
What was the principle point in controversy between Shore and Rose? the ability of Claiborne to pay the fees, or to maintain himself in prison; which being proved to the satisfaction of the Jury, they so found the fact specially, and the Court very properly gave judgment for the plaintiff. So, on the same principle, if a Sheriff brings suit against a creditor on a bond for payment of the prison fees of his insolvent debtor, he must aver and prove the insolvency of the prisoner before he can recover; but he is not bound to prove such insolvency before he has a right to demand the security required by law; for he has a right to make the requisition immediately on the prisoner’s being confined.
The proof of the solvency or insolvency of an imprisoned debtor, in my apprehension, rests on circumstances as the case may be. Where the creditor brings an action against the Sheriff or gaoler, to subject him to the payment of the debt, for having discharged the prisoner, as unable to pay, or to maintain himself in prison, when he was not so; or to recover money wrongfully paid for the maintenance of such prisoner, (as in the case of Shore against Rose,) the proof of the solvency of the prisoner lies on the creditor: And where a sheriff or gaoler brings suit against a creditor for the fees of his imprisoned debtor, the proof of the insolvency of the prisoner lies on the Sheriff or gaoler.
On these grounds I am of opinion that Younghusband was justified by law in discharging Duval out of custody; but, lest T be mistaken on this point, 1 proceed to consider the other, to wit, Whether the written discharge of the prisoner, by the Sheriff, did not exonerate the securities from the penalty of the bond for his 95 keeping within the ^prison rules, and leave the creditor to her remedy against the Sheriff only?
1 am to consider this point, then, on a presumption that the Sheriff had not a legal right to discharge the prisoner, but that he did so in his own wrong, and at his peril; and became immediately liable to the creditor or the amount of the debt: and he being so liable, why vex and distress an innocent security for the malfeasance of a public officer, of ability to answer for his own misconduct, instead of having immediate recourse against him? The appellee bound himself, his heirs, &c. with condition that the prisoner, Daniel Duval, should keep within the prison rules until thence discharged by due course of law; and being discharged by the Sheriff, in whose custody he was, that may well be considered as a discharge in due course of law ; as the Sheriff was the only executor of the law, he was the only person who could of right discharge the prisoner in any event.
Suppose the Sheriff in the written discharge, instead of saying it was for want of security for the prison fees, had stated that the prisoner had paid him the full amount of the debt and costs, would not that be considered as a discharge by due course of law, whether the money had, or had not, been paid to the Sheriff? or would the securities have been bound to prove an actual payment of it? I confidently conceive not; nor were they, as the case stood, bound to prove the insolvency of the prisoner.
Mr. Williams, though, contended that “if the debtor had tendered the whole debt and costs to the Sheriff, he would have had no right to discharge him !’’ Misc.able, indeed, would be the case of every prisoner confined for debt, should that be adjudged to be law !!
As to the recital in the discharge, that Duval was a prisoner within the bounds of the prison as laid off by the General Court, (noticed in the argument by Mr. Williams,) I believe it to be correct. The County gaol of Henrico has been used as the public gaol, ever since the removal of the 96 seat of government *to Richmond; and by several acts óf assemblj’, passed from time to time, the Judges of the General Court were empowered to superintend and regulate the public gaol; and the bounds laid off by direction of that Court, under the authority of one of those acts, have always been considered and used as the prison bounds of Henrico County; unless they have since been altered by order of the District Court. But, be that as it may, the circumstance, in my apprehension, does not affect the merits of this cause.
lyet us consider what was the true nature* intent, and spirit of the undertaking of the securities? It was that Daniel Duval should not escape, nor voluntarily depart out of the prison rules; but they did not mean to-be responsible for the misconduct of the Sheriff (with whom they had no privity, and who was the only person, I conceive, that in any event had a right to discharge the prisoner) in case he should discharge him without legal authority. The Sheriff had the same right over the prisoner, so far as respects his legal discharge, as if he had been confined in the debtors’ room of the gaol, and the key in the pocket of the Sheriff, who, at the time of his admission to office, had given ample security for the due and faithful performance of his duty ; and against whom for misfeasance or malfeasance in office, any person aggrieved by his misconduct, had a prompt and legal remedy by action on the Sheriff’s bond.
A Sheriff who discharges a prisoner contrary to law, makes himself liable for the debt, but cannot subject the innocent securities, who have no control over him, to loss or damage, by his own acts or default; for the Sheriff’s and prisoner’s-securities cannot, or ought not, to be both answerable at the same time, to the creditor for an escape; as that would be making them securities for each other, without the consent of either; and would deter many from acts of benevolence and kindness towards unfortunate persons imprisoned for debt, in becoming their securities for the prison bounds.
From the evidence and circumstances *46 97 disclosed in this ^record, I have a conviction that Daniel Duval was truly insolvent, unable to pay the prison fees, or to maintain himself in prison ; or, on a supposition that he might have been so, (which is the case of many unfortunate debtors,) what was he to do when the Sheriff told him “he was no longer his prisoner,” and gave him a discharge in writing, in which he stated his reasons for doing so? Was he to answer the Sheriff, “that he had no right to discharge him, and that if he would not maintain him in prison, he must and would lie there and perish for want of sustenance?” Such a determination would neither 'have been consistent with human prudence, nor within the utmost effort of human fortitude: and, if persisted in, of what advantage would it have been to the creditor? None at all; but, on the contrary, would have been a sure and certain means of the toss of the debt, at best, very doubtful; but at that time almost desperate: but by obeying the mandate of the Sheriff, it made him, if he acted illegally, liable for the debt; against whom the creditor ought immediately to have proceeded for the recovery of it: but, instead of doing so, she lies by for upwards of six years, and then brings suit against an innocent security, who had done her no injury-
Besides all this, the law never supposes a poor prisoner a proper judge of the official duties of an executive officer; or under what particular circumstances he may be legally discharged by the Sheriff, before the debt be paid; but those things remain altogether with the Sheriff; who', at his peril, is to conduct himself according to law.
On these grounds, I am of opinion that the judgment of the District Court is correct, and ought to be affirmed. And I am authorized to say that the late venerable and enlightened President of this Court, who heard the cause very fully and ably argued, was of the same opinion. But as a majority of the Court, now present, is of a different opinion, the judgment of the District Court is to be reversed, and judgment entered for the appellant.

 See act of 1772, c. 13, s. 1, Ch. Rev. 24.

 1 Hen. & Munf. 61.

 October term, 1805. MS.

 Laws Virg. 1794, c. 76, s. 86.

 April term, 1806, MS.

Note. But see 1 Rev. Code, c. 213, p. 368, 369, where the Courts are authorized to flx the fees of gaolers for the diet of prisoners, either committed for debt, or at the suit of the commonwealth; provided, that the allowance shall not exceed 34 cents per day. —Note in Original Edition.

 Call, 540.

 Laws of Virginia, ed. of 1769, p. 196, s. 21.

 1 Call, 50.

 1 Call, 484.

 1 Call, 543.